UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PENNIE BODLEY, | ) | CIVIL ACTION NO. 4:20-CV-267 |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | (ARBUCKLE, M.J.) |
| ANDREW SAUL, | ) | |
| Defendant | ) | |

<u>MEMORANDUM OPINION</u>

I.     INTRODUCTION

Plaintiff Pennie L. Bodley, an adult individual who resides within the Middle District of Pennsylvania, seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for supplemental security income under Title XVI of the Social Security Act. Jurisdiction is conferred on this Court pursuant to 42 U.S.C. §1383(c)(3)(incorporating 42 U.S.C. §405(g) by reference).

This matter is before me, upon consent of the parties pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. (Doc. 10). After reviewing the parties' briefs, the Commissioner's final decision, and the relevant portions of the certified administrative transcript, I find the Commissioner's final decision is supported by substantial evidence. Accordingly, the Commissioner's final decision is AFFIRMED.

Page 1 of 55

II.     BACKGROUND & PROCEDURAL HISTORY

On February 29, 2009, Plaintiff protectively filed applications for childhood disability insurance benefits and supplemental security income alleging that she became disabled on March 1, 1990 when she was four years old. (Admin. Tr. 59; Doc. 8-3, p. 6). Plaintiff's first and second applications for benefits were denied at the initial and ALJ hearing levels. (Admin. Tr. 104, Doc. 8-3, p. 50). On May 30, 2012, the Appeals Council issued a decision. *Id.* There is no evidence that Plaintiff appealed to the District Court.

On March 10, 2011, Plaintiff filed an application for supplemental security income (her third application for benefits) alleging she became disabled on February 14, 2008. (Admin. Tr. 76; Doc. 8-3, p. 22). Plaintiff's third application for benefits was denied at the initial and ALJ hearing levels. (Admin. Tr. 104; Doc. 8-3, p. 50). There is no evidence it was appealed any further. *Id.*

On February 21, 2013, Plaintiff filed an application for supplemental security income (her fourth application for benefits) alleging that she became disabled on February 14, 2008. (Admin. Tr. 91; Doc. 8-3, p. 37). Plaintiff's fourth application for benefits was denied at the initial, and ALJ hearing levels. (Admin. Tr. 104; Doc. 8-3, p. 50). It was appealed to the Appeals Council. *Id.* There is no evidence that Plaintiff appealed to the District Court.

On July 28, 2016, Plaintiff filed an application for supplemental security income (her fifth application for benefits). It was closed at the initial level. *Id.* There is no evidence it was appealed. *Id.*

On April 30, 2017, Plaintiff protectively filed an application for supplemental security income under Title XVI of the Social Security Act (her sixth application for benefits). (Admin. Tr. 12; Doc. 8-2, p. 13).  In this application, Plaintiff alleged she became disabled as of June 16, 2016, when she was thirty-one years old, due to the following conditions: hypothyroidism, depression, degenerative disc disease, lumbar bulging disc, herniated disc in neck, and colitis. (Admin. Tr. 214; Doc. 8-6, p. 8). Plaintiff alleges that the combination of these conditions affects her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, remember/memorize, complete tasks, concentrate, use her hands, and get along with others. (Admin. Tr. 251; Doc. 8-6, p. 45). Plaintiff has a high school education. (Admin. Tr. 21; Doc. 8-2, p. 22).

On July 26, 2017, Plaintiff's application was denied at the initial level of administrative review. (Admin. Tr. 12; Doc. 8-2, p. 13). On August 28, 2017, Plaintiff requested an administrative hearing. *Id.*

On September 18, 2018, Plaintiff, assisted by her counsel, appeared and testified during a hearing before Administrative Law Judge Mike Oleyar (the

"ALJ"). *Id*. On December 13, 2018, the ALJ issued a decision denying Plaintiff's application for benefits. (Admin. Tr. 22; Doc. 8-2, p. 23). On January 23, 2019, Plaintiff requested review of the ALJ's decision by the Appeals Council. (Admin. Tr. 146; Doc. 8-4, p. 27).

On December 16, 2019, the Appeals Council denied Plaintiff's request for review.  (Admin. Tr. 1; Doc. 8-2, p. 2).

On February 14, 2020, Plaintiff initiated this action by filing a Complaint. (Doc. 1). In the Complaint, Plaintiff alleges that the ALJ's decision denying the application is not supported by substantial evidence, and improperly applies the relevant law and regulations. *Id*. As relief, Plaintiff requests that the Court award benefits, or in the alternative remand with instructions to conduct a new administrative hearing. *Id*.

On April 17, 2020, the Commissioner filed an Answer. (Doc. 7). In the Answer, the Commissioner maintains that the decision holding that Plaintiff is not entitled to disability insurance benefits was made in accordance with the law and regulations and is supported by substantial evidence. (Doc. 7, ¶ 9). Along with his Answer, the Commissioner filed a certified transcript of the administrative record. (Doc. 8).

Plaintiff's Brief (Doc. 12) and the Commissioner's Brief (Doc. 15) have been filed. Plaintiff did not file a reply. This matter is now ripe for decision.

III.   STANDARDS OF REVIEW

A. SUBSTANTIAL EVIDENCE REVIEW – THE ROLE OF THIS COURT

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record. *See* 42 U.S.C. § 1383(c)(3) (incorporating 42 U.S.C. § 405(g) by reference); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent

conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966).

"In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." *Leslie v. Barnhart*, 304 F. Supp. 2d 623, 627 (M.D. Pa. 2003). The question before this Court, therefore, is not whether Plaintiff is disabled, but whether the Commissioner's finding that Plaintiff is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. *See Arnold v. Colvin*, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.") (alterations omitted); *Burton v. Schweiker*, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); *Ficca*, 901 F. Supp. 2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

B.  STANDARDS GOVERNING THE ALJ'S APPLICATION OF THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity

by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *see also* 20 C.F.R. § 416.905(a).[1] To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R. § 416.905(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. § 416.920(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. § 416.920(a)(4).

---

[1] Throughout this Report, I cite to the version of the administrative rulings and regulations that were in effect on the date the Commissioner's final decision was issued. In this case, the ALJ's decision, which serves as the final decision of the Commissioner, was issued on December 13, 2018.

Between steps three and four, the ALJ must also assess a claimant's RFC. RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); *see also* 20 C.F.R. § 416.920(e); 20 C.F.R. § 416.945(a)(1). In making this assessment, the ALJ considers all the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. § 416.945(a)(2).

At steps one through four, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. 2 U.S.C. § 1382c(a)(3)(H)(i) (incorporating 42 U.S.C. § 423(d)(5) by reference); 20 C.F.R. § 416.912(a); *Mason*, 994 F.2d at 1064.  Once this burden has been met by the claimant, it shifts to the Commissioner at step five to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. § 416.912(b)(3); *Mason*, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination.

Thus, to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. *Id.* at 706-707. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." *Schaudeck v. Comm'r of Soc. Sec.*, 181 F. 3d 429, 433 (3d Cir. 1999).

## IV.   DISCUSSION

### A.   THE ALJ'S DECISION DENYING PLAINTIFF'S APPLICATION

In his December 2018 decision, the ALJ evaluated Plaintiff's application at steps one through five of the sequential evaluation process.

At step one, the ALJ found that Plaintiff did not engage in substantial gainful activity at any point between April 30, 2017 (Plaintiff's application date) and December 13, 2018 (the date the ALJ decision was issued) ("the relevant period"). (Admin. Tr. 14; Doc. 8-2, p. 15). At step two, the ALJ found that, during the relevant period, Plaintiff had the following medically determinable severe impairments: post-surgical hypothyroidism, history of thyroid cancer and thyroidectomy, history of vasovagal syncope, cervical and lumbar degenerative disc disease, left hip

degenerative joint disease, right carpal tunnel syndrome (CTS), right wrist ganglion cyst partial tear of ulnar surface of triangular fibrocartilage (TFC) status post wrist arthroscopy, debridement and synovectomy carpal and radiocarpal joint, pinning, TFC repair and ganglion cyst excision, right ankle degenerative joint disease, right shoulder derangement and impingement, left rotator cuff syndrome with impingement and bicipital tendonitis, major depressive disorder, bipolar disorder, anxiety disorder, and post-traumatic stress disorder. (Admin. Tr. 14; Doc. 8-2, p. 15). The ALJ found that the following impairments were medically determinable but non-severe: second finger fracture, history of otalgia, temporomandibular joint disorder, sensorineural hearing loss, history of colitis, history of migraines, and diabetes mellitus type II. *Id.* At step three, the ALJ found that, during the relevant period, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Admin. Tr. 15; Doc. 8-2, p. 16).

Between steps three and four, the ALJ assessed Plaintiff's RFC. The ALJ found that, during the relevant period, Plaintiff retained the RFC to engage in light work as defined in 20 C.F.R. § 416.967(b) except Plaintiff could:

> Frequently use foot controls with the bilateral lower extremities; frequent reaching handling, fingering and feeling with right extremity; frequent reaching with left upper extremity; frequent balancing, stooping, kneeling, crouching, crawling and climbing on ramps and

stairs, but never climbing on ladders, ropes or scaffolds; never exposure to hazards such as unprotected heights and dangerous moving mechanical parts and operating a motor vehicle; limited to perform simple routine tasks, but not at a production rate pace (assembly line work) with occasional changes in the work setting; and limited to frequent interaction with supervisors, coworkers and the public.

 (Admin. Tr. 17; Doc. 8-2, p. 18).

At step four, the ALJ found that, Plaintiff had no past relevant work. (Admin. Tr. 21; Doc. 8-2, p. 22). At step five, the ALJ found that, considering Plaintiff's age, education and work experience, Plaintiff could engage in other work that existed in the national economy. *Id*. To support his conclusion, the ALJ relied on testimony given by a vocational expert during Plaintiff's administrative hearing and cited the following three (3) representative occupations: office helper (DOT #239.567-010); cashier (DOT #211.462-010); and folder (DOT #789.687-066). (Admin. Tr. 22; Doc. 8-2, p. 23).

### B. Whether the ALJ Properly Evaluated the Medical Opinion Evidence of Record

Plaintiff argues that the ALJ did not properly evaluate two medical opinions of record. The first is by a consultative examiner, Dr. Davis. The second is by a certified physician assistant, PA-C Friese.

The Commissioner's regulations define a medical opinion as "a statement from a medical source about what [a claimant] can still do despite [his or her]

impairment(s) and whether [he or she has] one or more impairment-related limitations or restrictions in the following abilities":

(i)     [The] ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching);

(ii)    [The] ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting;

(iii)   [The] ability to perform other demands of work, such as seeing, hearing, or using other senses; and

(iv)    [The] ability to adapt to environmental conditions, such as temperature extremes or fumes.

20 C.F.R. § 416.913(a)(2). A "medical source" is "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State of Federal Law, or an individual who is certified by a States as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law." 20 C.F.R. § 416.902(d). If one medical source submits multiple medical opinions, and ALJ will articulate how he or she considered the medical opinions from that medical source in a single analysis. 20 C.F.R. § 416.920c(b)(1).

An ALJ's consideration of competing medical opinions is guided by the following factors: the extent to which the medical source's opinion is supported by relevant objective medical evidence and explanations presented by the medical source (supportability); the extent to which the medical source's opinion is consistent with the record as a whole (consistency); length of the treatment relationship between the claimant and the medical source; the frequency of examination; the purpose of the treatment relationship; the extent of the treatment relationship; the examining relationship; the specialization of the medical source and any other factors that tend to support or contradict the opinion. 20 C.F.R. § 416.920c(c).

The most important of these factors are the "supportability" of the opinion and the "consistency" of the opinion. 20 C.F.R. § 416.920c(b)(2). The ALJ will explain how he or she considered the "supportability" and "consistency" of a medical source's opinion. The ALJ may, but is not required to, explain his or her consideration of the other factors unless there are two equally persuasive medical opinions about the same issue that are not exactly the same. 20 C.F.R. § 404.1520c(b)(3). Unlike prior regulations, under the current regulatory scheme, when considering medical opinions, an ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior

administrative medical finding(s), including those from your medical sources." 20

C.F.R. § 416.920c(a).

> 1.   Whether the ALJ Properly Evaluated Dr. Davis's Opinion
> About Plaintiff's Mental Health Limitations

On July 15, 2017, Tommy Davis, Ph.D. ("Dr. Davis") evaluated Plaintiff's

mental impairments at the Social Security Administration's request. As part of this

evaluation, Dr. Davis wrote a narrative report and completed a medical source

statement. (Admin. Tr. 672-679; Doc. 8-9, pp. 140-147).[2]

In his check-box medical source statement, Dr. Davis was asked to rate

Plaintiff's ability to perform certain work-related mental activities on the following

scale: none (able to function in this area independently, appropriately, effectively,

and on a sustained basis); mild (functioning in this area independently,

appropriately, effectively, and on a sustained basis is slightly limited); moderate

(functioning in this area independently, appropriately, effectively, and on a sustained

basis is fair); marked (functioning in this area independently, appropriately,

effectively, and on a sustained basis is seriously limited); and extreme (unable to

function in this area independently, appropriately, effectively, and on a sustained

basis). (Admin. Tr. 677; Doc. 8-9, p. 145).

---

[2] Dr. Davis' report and medical source statement are also reproduced in another
part of the record. (Admin. Tr. 839-846; Doc. 8-11, pp. 44-51).

Dr. Davis assessed that Plaintiff had a "marked" limitations in her ability to: make judgments on complex work-related decisions; and respond appropriately to usual work situations and changes in a routine work setting. Dr. Davis found that Plaintiff had "moderate" limitations in the following activities: understanding and remembering complex instructions; carrying out complex instructions; and interacting appropriately with the public, supervisors, and co-workers. Dr. Davis found that Plaintiff had mild limitations in her ability to: understand and remember simple instructions; carry out simple instructions; and make judgments on simple work-related decisions. Dr. Davis provided the following explanation in support of his findings:

> The claimant exhibits significant depressive and anxiety symptoms that impair her ability to make judgments on complex work-related decisions.
>
> . . . .
>
> The claimant's anxiety and depressive symptoms [illegible word] impair her ability to manage the social complexities of work [illegible word]

(Admin. Tr. 677-678; Doc. 8-9, pp. 145-146).

In his decision, the ALJ found that the marked limitations in Dr. Davis' opinion were not persuasive, but that the mild to moderate limitations were entitled to partial weight. In doing so, he explained:

In June 2017, Dr. Davis opined that the claimant had generally mild to moderate functional limitations due to her impairments, but marked functional limitations with respect to ability to make judgments on complex work-related decisions and respond appropriately to usual work situations and to changes in a routine work setting. (Exhibits D14F; D21F/48-50) This assessment has been considered, but not found persuasive with respect to the finding of marked functional limitations and partial weight with respect to the finding of mild to moderate functional limitations. As discussed above, the mental status examination findings throughout the record, including Dr. Davis' assessment, generally showed mild to benign findings and fails to support more than a finding of moderate functional limitations. Notably, there is no indication in the record that the claimant has be psychiatrically hospitalized or requires a structured living arrangement during the relevant period and the record shows that her symptoms are stable on medication.

(Admin. Tr. 20; Doc. 8-2, p. 21).

Plaintiff argues:

13. Additionally, the Psychological Evaluator for the Social Security Administration found that the Plaintiff was markedly limited in her ability to make judgments on complex work related decisions and markedly limited in her ability to respond appropriately to the usual work situations and to changes in a routine work setting.

14. The Opinion of the Administrative Law Judge on Page 9, paragraph 3 of the Notice of Decision – Unfavorable, dated December 13, 2018, accepted the mild and moderate limitations of Dr. Davis but rejected the marked limitations without adequate cause only indicating that "there is no indication in the record that the claimant had been psychiatrically hospitalized or required a structured living arrangement during the relevant period and the record shows that her symptoms are stable on medication."

15. In fact, psychiatric hospitalization and the requirement of a structured living arrangement would be strong evidence of extreme

Page 16 of 55

limitations and it is possible to be markedly limited without those requirements and those were the only two (2) reasons the Administrative Law Judge gave in support of discounting the testimony of Dr. Davis, again an evaluator employed by the Social Security Administration in this matter. In addition, the Plaintiff was actually found to have a number of mental health diagnosis which constitute a severe impairment including major depressive disorder, bipolar disorder, anxiety disorder and post-traumatic stress disorder, all of which diagnosis's when found to be severe impairments by the Administrative Law Judge justify a marked finding of limitations as made by Dr. Davis.

(Doc. 12, pp. 6-8).

In response, the Commissioner argues:

Contrary to Plaintiff's assertion at pages 6-7 of her brief, substantial evidence supports the ALJ's finding that Dr. Davis's marked limitations were not persuasive. The ALJ correctly applied the new regulatory framework in evaluating Dr. Davis's marked limitations, (Tr. 20), and reasonably explained that the marked limitations were not persuasive because they were inconsistent with the record evidence (Tr. 20). Specifically, the ALJ noted that Dr. Davis's own mental status examination documented largely benign findings (Tr. 20). Indeed, other than an anxious mood and restricted affect, Dr. Davis's examination revealed that Plaintiff was alert and oriented to person, place, and time; cooperative and well groomed; had fair social skills and appropriate eye contact; normal motor behavior; fluent speech; adequate expressive and receptive language; coherent and goal directed through processes; no hallucinations or delusion; clear sensorium; and intact attention and concentration (Tr. 674). Plaintiff could count to 10; perform simple calculations; count to 20 by three; count to 100 by 7s; repeat three out of three objects immediately and two out of three after five minutes and repeat four digits forward and three backward (Tr. 675).

In addition to Dr. Davis's examination findings, the ALJ also explained that other mental status examinations likewise documented only mild findings and no more than moderate limitations (Tr. 20).

Plaintiff was consistently assessed as being alert and oriented x3; having normal speech and language; intact recent and remote memory; and normal attention and concentration (Tr. 361, 381, 728). Plaintiff did not even seek mental health treatment until May 2017, and a mental status examination at that time revealed that she was cooperative and had good rapport; made good eye contact; had organized and goal-directed thought processes; normal thought content; no hallucinations or ideations; intact memory and concentration; fair insight and judgment; and good capacity for activities of daily living (Tr. 849). Plaintiff's anxious mood responded well to Lexparo, and, within two months, she reported doing "much better" (Tr. 855). The ALJ also noted that Plaintiff did not require psychiatric hospitalization and that her symptoms were stable on medication (Tr. 20).

Moreover, Dr. Urbanowicz, the state agency psychologist, explained that Dr. Davis's opinion was an overestimate of Plaintiff's functional limitations, relied too heavily on Plaintiff's subjective reports of her symptoms, and was inconsistent with the record evidence (Tr. 116-17). Unlike Dr. Davis's marked limitations, the ALJ found that Dr. Urbanowicz's opinion was persuasive, because it was consistent with the evidence and supported by the objective findings in the record including benign mental status examination findings and Plaintiff's responsiveness to treatment (Tr. 20).

Because the ALJ correctly found Dr. Davis's marked limitations to be unpersuasive in accordance with the new regulatory framework, and, because substantial evidence – not a high bar; only more than a mere scintilla of evidence – supports the ALJ's finding, the Court must affirm.

(Doc. 15, pp. 41-43).

As an initial matter, I note that the ALJ cited four, not two, reasons for discounting the marked limitations set forth by Dr. Davis: (1) "the mental status examination findings throughout the record, including Dr. Davis' assessment,

generally showed mild to benign findings and fails to support more than a finding of moderate functional limitations"; (2) "no indication in the record that the claimant has be psychiatrically hospitalized"; (3) no indication that Plaintiff "requires a structured living arrangement during the relevant period"; and (4) "the record shows that her symptoms are stable on medication." (Admin. Tr. 20; Doc. 8-2, p. 21). Plaintiff argues that the second and third reasons are inadequate because there is no requirement that a person needs to be psychiatrically hospitalized or live in a supportive living arrangement to support a "marked" limitation. I agree that there is no such requirement. However, this error would only be a basis for remand if the second and third reasons were the only ones cited by the ALJ, and in this case they were not.

Next, Plaintiff argues that her diagnoses—bipolar disorder, post traumatic stress disorder, anxiety disorder, and depressive disorder—are enough to establish "marked" limitations. I disagree. A diagnosis alone is not enough to establish a "marked" limitation in a particular area.

Last, I agree with the Commissioner's position that the ALJ's rationale that the marked limitations assessed by Dr. Davis are not supported by his own objective findings or the objective findings made by Plaintiff's treating psychiatrist in the

relevant treatment records (the first reason cited in the decision) is supported by the record and is a proper basis to discount this opinion under the relevant regulations.

On May 25, 2017, Plaintiff sought mental health treatment at Universal Community Behavioral Health, and was examined by Sreedevi Komarneni, M.D. ("Dr. Komarneni"). During this first examination, Dr. Komarneni diagnosed Plaintiff with Bipolar Disorder (Mixed), Post Traumatic Stress Disorder, and Major Depressive Disorder (recurrent, moderate). (Admin. Tr. 853; Doc. 8-11, p. 58). Dr. Komarneni recorded the following findings as part of the mental status and cognitive examination:

MENTAL STATUS EXAMINATION:

- General appearance/behavior/attitude: The patient is a 32-year-old white female having good eye contact and good rapport. She is slightly obese, clean and cooperative.
- Motor activity: Agitated and restless.
- Speech: Soft and coherent.
- Mood: Anxious.
- Affect: Mood congruent.
- Thought process: Organized and goal directed, not tangential or circumstantial.
- Thought content: Normal, but she has paranoia with paranoid delusions that people are looking at her, talking about her, and trying to get her and he does not go out that much and she is afraid of crowds.
- Perceptual disturbances: None. No auditory or visual hallucinations.
- Suicidal ideation: Denies. No intent or plan to hurt herself. Access to guns: Denies.

Page 20 of 55

- Homicidal ideation: Denies.

COGNITIVE EXAMINATION:

- Level of consciousness: Awake.
- Intellectual function: Average. Test used: Based on fund of knowledge.
- Orientation: Oriented to name, place and time.
- Short term memory: Intact.       Test used: She is able to recall three out of three after five minutes, "TABLE," "CHAIR," and "PEN."
- Long term memory: Intact.       Test used: She knows the President and her birth date.
- Concentration: Intact.    Test used: she is able to spell "CHAIR" forwards and backwards.
- Insight: Fair.       How measured: Based on acknowledging her problems, diagnoses and contributors.
- Judgment: Fair.    How measured: Based on her moral and health issues.
- Capacity for Activities of Daily Living: Good.

(Admin. Tr. 852-853: Doc. 8-11, pp. 57-58).

On July 15, 2017, Dr. Davis noted that "Ms. Bodley was cooperative during the evaluation and exhibited fair social skills." (Admin. Tr. 674; Doc. 8-9, p. 142). Dr. Davis also assessed that Plaintiff's judgment seemed "fair." (Admin. Tr. 675; Doc. 8-9, p. 143).

On July 27, 2017, Dr. Komarneni examined Plaintiff. During that examination Dr. Komarneni noted the following objective findings:

The patient is a 32-year-old white female, having good eye contact and good rapport, pleasant and cooperative. Mood is fair. Affect is mood

congruent. Anxiety noticed. She is not a danger to self or others. No psychosis.

(Admin. Tr. 855; Doc. 8-11, p. 60).

On September 26, 2017, Dr. Komarneni examined Plaintiff. During that examination, Dr. Komarneni noted the following objective findings:

The patient is a 32-year-old white female, having good eye contact and good rapport, smiling, able to discuss her problems in a goal directed manner. No evidence of psychosis. She is not a danger to self or others.

(Admin. Tr. 857; Doc. 8-11, p. 62).

On December 13, 2017, Dr. Komarneni examined Plaintiff. During that examination, Dr. Komarneni noted the following objective findings:

The patient is a 32-year-old Caucasian female, having good eye contact and good rapport. Mood is good. Affect is mood congruent. She is smiling and in good mood. Discussed about her boyfriend who is from New York and he wants to move to New York and she went there and checked on it and she is a little anxious about the move, but she would like to think about it. She denies any suicidal or homicidal ideations, thoughts or plans.  No evidence of psychosis.

(Admin. Tr. 859; Doc. 8-11, p. 64).

On March 7, 2018, Dr. Komarneni examined Plaintiff. During that examination, Dr. Komarneni noted the following objective findings:

The patient is a 32-year-old Caucasian female, having good eye contact and good rapport. Mood is good. Affect is mood congruent. Discussed about her horses and how she enjoys horses. Insight and judgment seem to be intact. She is not a danger to self or others. No evidence of psychosis.

(Admin. Tr. 861; Doc. 8-11, p. 66).

On June 5, 2018, Dr. Komarneni examined Plaintiff. During that examination,

Dr. Komarneni noted the following objective findings:

> The patient is a 32-year-old Caucasian female, having good eye contact
> and good rapport. Mood is fair. Affect is mood congruent. Discussed
> about her sleep issues and denies anything, which is giving her sleep
> problems. Insight and judgment are intact. She is not a danger to self or
> others. No psychosis.

(Admin. Tr. 863; Doc. 8-11, p. 68).

On the issue of whether the ALJ correctly concluded that a "marked"
impairment in making judgments on complex work-related decisions was not
supported by the record, I find that the ALJ's conclusion is supported by substantial
evidence. Plaintiff does not cite to any medical record that supports this limitation.
Based on my own review of Dr. Davis' narrative report and Plaintiff's mental health
records summarized above, Plaintiff's judgment was characterized as "fair" by both
her treating source and by Dr. Davis himself.[3] Accordingly, I am not persuaded that
remand is required for further consideration of this aspect of Dr. Davis' opinion.

On the issue of whether the ALJ correctly concluded that a "marked"
impairment in responding to usual work situations and changes in a routine work

---

[3] Referring to the questionnaire itself, a "marked" limitation is defined as "seriously
limited." By contrast, the definition of "moderate" limitation is defined as "fair"
ability.

setting, I also find that the ALJ's conclusion is supported by substantial evidence. Once again, Plaintiff does not cite to any specific medical record that supports this limitation. Based on my review of Dr. Davis' narrative report and Plaintiff's mental health records summarized above, nothing suggests Plaintiff had difficulty adapting to changes in routine. Moreover, the ALJ limited Plaintiff to occupations where there would be only "occasional" (defined as very little up to 1/3 of the time) changes in routine. Because Plaintiff has cited to no evidence that suggests she would be unable to tolerate occasional workplace changes, I am not persuaded that remand is required for further evaluation of this aspect of Dr. Davis' medical opinion.

2.   Whether the ALJ Properly Evaluated The Employability
Assessment Form Completed by PA-C Carrie B. Friese

The record in this case includes one page of a Pennsylvania Department of Public Welfare Employability Assessment form. (Admin. Tr. 599; Doc. 8-9, p. 27). The form was filled out by Carrie B. Friese, a Certified Physician Assistant from the Family Practice of Renovo. *Id.* On the form, PA-C Friese was asked to select Plaintiff's employability from the following options: permanently disabled; temporarily disabled 12 months or more; temporarily disabled less than 12 months; and employable. PA-C Friese checked the box for "employable" and hand-wrote underneath "with accommodations." *Id.* PA-C Friese listed Plaintiff's current

diagnoses as "chronic shoulder pain, subacromial impingement." *Id.* The form did not include any discussion of what "accommodations" might be necessary.

In his decision, the ALJ found that PA-C Friese's employability assessment form was not persuasive. In doing so, he explained:

> The employability assessment by Carrie B. Friese, Pa-C in October 2016 that the claimant was employable but with accommodations (Exhibit D10F/26), has not been found persuasive because it fails to provide specific details regarding what accommodations are required.

(Admin. Tr. 20; Doc. 8-2, p. 21).

Plaintiff argues:

> 20. The Administrative Law Judge also rejected the Medical Source Statement form completed by the Plaintiff's treating physician (see Exhibit D10F/26 of the Notice of Decision - Unfavorable dated December 13, 2018, marked as Exhibit A) and only cited that is found not persuasive because it fails to provide specific details regarding what accommodations are required, when in fact, a review of the office records of that office provide more details and specifics as to the Plaintiff's employability and need for accommodations which are supportive of the limitations set forth.

(Doc. 12, p. 9).

In response, the Commissioner argues:

> Lastly, Plaintiff contends that the ALJ erred by rejecting the October 2016 employability assessment from Ms. Friese, a physician's assistant in Dr. Conly's office (Pl's Br. at 9). In particular, Plaintiff suggests that the ALJ erred by finding the assessment not persuasive because it failed to provide specific accommodations, when, Plaintiff suggests, "a review of the office records of that office provide more details and specifics as to the Plaintiff's employability and need for

accommodations which are supportive of the limitations set forth" (Pl's Br. at 9). Plaintiff's argument is without merit.

In the first instance, Plaintiff has failed to identify, let alone cite to, any evidence in the record that documents any functional limitations or "accommodations" from Ms. Friese, Dr. Conly, or any of Plaintiff's treating physicians. Nor could she. A review of the record confirms that none of Plaintiff's treating providers documented any functional limitations related to Plaintiff's impairments, nor that she was unable to work. To the contrary, as evidenced by the ALJ's comprehensive discussion, the record reveals that Plaintiff had various impairments, but that "the symptomology due to these impairments were reduced to manageable levels with treatment during the relevant period" (Tr. 20). Thus, Plaintiff's argument fails as a matter of fact.

Moreover, the ALJ correctly evaluated Ms. Friese's October 2016 opinion that Plaintiff was "employable" with accommodations in accordance with the new regulatory framework, and explained that it was not persuasive because it provided no details about what accommodations were allegedly required (Tr. 20). In other words, because the opinion was devoid of any accommodations or functional limitations, Ms. Friese's opinion was unsupported by the evidence of record. The ALJ's evaluation of Ms. Friese's opinion provided sufficient articulation for finding it unpersuasive; there was no error.

Ultimately, Plaintiff asks this Court to re-weigh the evidence relating to her impairments and decide the outcome of this case differently. This request is impermissible under the substantial evidence standard of review. Because substantial evidence—not a high standard; more than a mere scintilla—supports the ALJ's evaluation of the evidence, the Court should affirm the ALJ's decision.

(Doc. 15, pp. 44-45).

Under the Commissioner's regulations for evaluating opinion evidence, "[t]he more relevant the . . . supporting explanations presented by a medical source are to

support his or her medical opinion(s) . . ., the more persuasive the medical opinions . . . will be." 20 C.F.R. § 416.920c(c)(1). Thus, the a lack of explanation by the source is a proper basis to discount a source's opinion. I also note that, PA-C Friese's opinion, although discounted, is not inconsistent with the ALJ's conclusion, in which he found Plaintiff could work or is "employable" subject to the restrictions or "accommodations" set forth in the RFC assessment.

To the extent Plaintiff argues that "the office records of that office provide more details and specifics as to the Plaintiff's employability and need for accommodations which are supportive of the limitations set forth," I am not persuaded. Plaintiff did not cite to any record that supports this argument, and the court is not required to sift through the entire record in this case on its own. The record in this case contains over 200 pages of records from Family Practice of Renovo, where Plaintiff was treated by several people, including PA-C Friese. (Admin. Tr. 287-335, 535-651, 793-796, 800-848; Doc. 8-7, pp. 3-51, Doc. 8-9, pp. 3-119, Doc. 8-10, pp. 115-118, Doc. 8-11, pp. 5-53). The full administrative record in this case is over 800 pages. This Court's Local Rules provide that "[e]ach contention [raised in a Plaintiff's brief] must be supported by *specific reference to the portion of the record relied upon* and by citations to statutes, regulations and cases supporting plaintiff's position." L.R. 83.40.4(c) (emphasis added). "Judges are

not like pigs, hunting for truffles buried in the record." *Albrechtsen v. Bd. of Regents of Univ. of Wis. Sys.,* 309 F.3d 433, 436 (7th Cir. 2002); *see e.g. Elmore v. Clarion Univ.*, 933 F.Supp. 1237, 1247 (M.D. Pa. 1996) (noting that a Plaintiff's general reference to over 250 pages of deposition testimony is "wholly inappropriate," and holding that a litigant who "fails to press a point by supporting it with pertinent authority or by showing why is it is a good point despite a lack of authority" forfeits the point).

C.    WHETHER THE ALJ ADEQUATELY EVALUATED PLAINTIFF'S STATEMENTS ABOUT HER SYMPTOMS

During the administrative hearing, Plaintiff made the following statements in response to questions about the use of her hands:

Q    And you talked about your problem with your hands. How long can you use your right hand before you start to have problems?

A    About 10, 15 minutes before it goes numb.

Q    When it goes numb, what are you able to do with it at that point?

A    Nothing.

Q    Can you use it as an assist, to help your left hand?

A    No. Once it goes numb, I can't do nothing with it.

Q    Okay. You say 10 to 15 minutes so I can use it, how long does it take for it to get where you can use it again?

A    Three, four hours, maybe longer.

Q    So if you were using it in the morning, and you worked with it for a while, and it became numb, you wouldn't be able to use it again until the afternoon?

A    right.

Q    again, would it take about the same time to become problematic for you in the afternoon?

A    Yeah.

Q    Ten, 15 minutes?

A    Minutes, yep.

Q    Have you told your doctors the problems you're having?

A    Yes.

Q    And have they offered—what happened originally? You said you'd had some surgery on your wrist.

A    They're not really sure how I got the injury, but the surgery, they went in and removed a cyst and fixed tendons, and fixed carpal tunnel.

Q    Now, when did that happen? When were those surgeries, or surgery?

A    January of this year.

Q    Okay. And who did the surgery?

A    Steven Goldberg in Bloomsburg.

Q    And have you worked since then?

A    No.

(Admin. Tr. 38-39; Doc. 8-2, pp. 39-40).

In his decision, the ALJ summarized Plaintiff's testimony. He addressed the

evidence related to Plaintiff's use of her hands as follows:

> Treatment notes show that in lane January 2017, due to a history of ganglion cyst and partial tear of ulnar surface of TFC, the claimant underwent right wrist arthroscopy with joint debridement and synovectomy of both mid carpal and radiocarpal joints with lunotriquetral and triquetrohamate pinning for carpal instability, TFC repair and ganglion cyst excision. As of February 2017, it was noted that post-surgery, the claimant was doing well with pain level at 6/10 and wearing custom long arm orthosis with no complaints. Physical examination showed good sensation, good finger and elbow motion and only mild tenderness. The pins were removed in March 2017. As of April 2017, reported pain level was at 5/10 and the claimant [sic] that she returned some of her normal activities including work with horses. Physical examination showed good sensation, wrist stiffness as expected, ability to make a full fist and only mild tenderness (Exhibit D8F/3-4, 8-9, 18, 20, 24-25; D10F/8) In December 2017, it was indicated that the surgery resulted in a good outcome. (D21F/8).

(Admin. Tr. 18; Doc. 8-2, p. 19).

Ultimately, the ALJ discounted Plaintiff's testimony regarding the limitations

in her right hand because it was "not fully supported by the record, which shows

improvements after surgery with good hand strength." (Admin. Tr. 20; Doc. 8-2, p.

21).

Plaintiff argues:

17. The standards for determining whether objective medical evidence exists to justify symptoms of the Claimant and find them credible as set forth at SSR 16-3p, which applies to both Title II and Title XVI claims and provides "In determining whether an individual is disabled we consider all the individual's symptoms, including pain in the extent to

which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record. We define a symptom as the individual's own description or statement of his or her physical or mental impairments. Under our Regulations, an individual's statement of symptoms alone are not enough to establish the existence of a physician or mental impairment or disability. However, if an individual alleges impairment related symptoms, we must evaluate those symptoms using a two step process set forth in our Regulations.

18. First, we must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms, such as pain.

19. Second, once an underlying physical or mental impairment(s) could reasonably be expected to produce an individual's symptoms is established, we evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit the individuals ability to perform work related activities for an individual or to function independently, appropriately and effectively in an age appropriate manner for a child . . . ."

The factors are set forth in 20 CFR 404.1529(c)(3) and 416.929(c)(3). Under that two step approach, there clearly are medical diagnoses's [sic] as found to be severe impairments by the Administrative Law Judge in their [sic] Unfavorable Decision and second of all, the Claimant testified the intensity and persistence of her individual symptoms including pain and significantly loss of use of her right hand for no more than 15-20 minutes in the morning and 15-20 minutes in the afternoon, which the Vocational Expert testified to would be disabling.

(Doc. 12, pp. 8-9).

In response, the Commissioner argues:

Here, consistent with the regulations, the ALJ appropriately determined that Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms, but that her statements

Page 31 of 55

concerning the intensity, persistence and limiting effects of such symptoms were "not entirely consistent with the medical and other evidence in the record" (Tr. 18). In so finding, the ALJ specifically considered Plaintiff's statements regarding her pain and other symptoms, including her alleged functional limitations and difficulties handling stress and changes in routine (Tr. 17-18). Then, consistent with the regulations, the ALJ reviewed the medical evidence, including treatment records, examination findings, and diagnostic images, and explained his reasons for discounting Plaintiff's subjective complaints (Tr. 17-21). Specifically, the ALJ explained that, with the exception of wrist surgery, Plaintiff's impairments were treated conservatively throughout the relevant period (Tr. 18-19). The ALJ also noted that Plaintiff's wrist impairment improved with surgery, and that Plaintiff herself reported that the surgery resulted in a good outcome (Tr. 18-19).

But that was not all. The ALJ also considered Plaintiff's inconsistent statements regarding her activities and limitations. For example, the ALJ noted that, although Plaintiff testified at the hearing that she did not have horses or care for them (Tr. 17-18), the record documented the opposite (Tr. 20). Indeed, on numerous occasions, the record confirmed that, throughout the relevant period, Plaintiff worked with, cared for, rode, and showed horses (Tr. 20, 353, 451, 535, 754, 805, 851, 855, 857, 861). Likewise, the ALJ explained that at the hearing, Plaintiff testified that surgery did not improve her hand and wrist pain (Tr. 17). Conversely, the record documented that Plaintiff's hand and wrist pain improved considerably with surgery (Tr. 20, 451); indeed, in December 2017, Plaintiff advised Dr. Donio that her right wrist surgery resulted in a "good outcome" (Tr. 805).

In sum, the ALJ specifically considered and reasonably evaluated Plaintiff's subjective complaints in light of the applicable regulations and governing law. The ALJ did not (and was not required to) find Plaintiff disabled based on her subjective complaints alone.

(Doc. 15, pp. 34-35).

The Commissioner's regulations define "symptoms" as the claimant's own description of his or her impairment. 20 C.F.R. § 416.902(i). The ALJ is not only permitted, but also required, to evaluate the claimant's statements about all symptoms alleged and must decide whether and to what extent a claimant's description of his or her impairments may be deemed credible. In many cases, this determination has a significant impact upon the outcome of a claimant's application, because the ALJ need only account for those symptoms – and the resulting limitations – that are credibly established when formulating his or her RFC assessment. *Rutherford*, 399 F.3d at 554. To facilitate this difficult analysis, the Commissioner has devised a two-step process that must be undertaken by the ALJ to evaluate a claimant's statements about his or her symptoms.

First, the ALJ must consider whether there is an underlying medically determinable impairment that can be shown by medically acceptable clinical and laboratory diagnostic techniques that could reasonably be expected to produce the symptom alleged. 20 C.F.R. § 416.929(b). If there is no medically determinable impairment that could reasonably produce the symptom alleged, the symptom cannot be found to affect the claimant's ability to do basic work activities. 20 C.F.R. § 416.929(b); SSR 16-3p, 2016 WL 1119029.

Second, the ALJ must evaluate the intensity, persistence, and limiting effects of the symptoms which can be reasonably attributed to a medically determinable impairment. 20 C.F.R. § 416.929(c)(1). Symptoms will be determined to reduce a claimant's functional capacity only to the extent that the alleged limitations and restrictions can reasonably be accepted as consistent with objective medical evidence and other evidence of record. 20 C.F.R. § 416.929(c)(4). However, an ALJ will not reject statements about the intensity, persistence, or limiting effects of a symptom solely because it is not substantiated by objective evidence. 20 C.F.R. § 416.929(c)(3). Instead, the ALJ will evaluate the extent to which any unsubstantiated symptoms can be credited based on the following factors: the claimant's daily activities; the location, duration, frequency, and intensity of the claimant's pain or other symptoms; any factor that precipitates or aggravates the claimant's pain or other symptoms; the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate his or her pain or other symptoms; any treatment, other than medication, the claimant receives or has received for relief of his or her pain or other symptoms; any measures the claimant uses or has used to relieve his or her pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and any

other factors concerning functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. § 416.929(c)(3).

An ALJ's findings based on the credibility of a claimant are to be accorded great weight and deference, since an ALJ is charged with the duty of observing a witness's demeanor and credibility. *Frazier v. Apfel*, No. 99-CV-715, 2000 WL 288246, at *9 (E.D. Pa. Mar. 7, 2000) (*quoting Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)). An ALJ is not free to discount a claimant's statements about his or her symptoms or limitations for no reason or for the wrong reason. *Rutherford*, 399 F.3d at 554.

Plaintiff points to her testimony regarding her hand impairment and syncope and generally alleges that her testimony should be fully credited. She supports this argument by citing to the Commissioner's Social Security Ruling 16-3p. In fact, Plaintiff's entire argument, except for the second paragraph of ¶ 19 in Plaintiff's brief appears to be a direct quote from that ruling. Although Plaintiff summarizes the two-step process for evaluating a claimant's statements about his or her symptoms, she does not explain how the ALJ's application of the process was defective in this case or identify any evidence relevant under the 20 C.F.R. § 416.929(c)(3) factors that was ignored or mischaracterized by the ALJ.

Given that an ALJ's assessment of a Plaintiff's testimony is entitled to deference, and that Plaintiff has not articulated any basis to disturb the ALJ's decision to discount Plaintiff's testimony that she could not use her hands for more than 15 minutes at a time for a total of 30 minutes per day even after she had corrective surgery, I am not persuaded that remand is required for further evaluation of Plaintiff's statements.

      D.    WHETHER THE ALJ'S RFC ASSESSMENT ACCOUNTS FOR ALL OF PLAINTIFF'S CREDIBLY ESTABLISHED LIMITATIONS

One oft-contested issue in this setting relates to the claimant's residual capacity for work in the national economy. As discussed above, a claimant's RFC is defined as "the most [a claimant] can still do despite [his or her] limitations," taking into account all of a claimant's medically determinable impairments. 20 C.F.R. § 416.945. In making this assessment, the ALJ is required to consider the combined effect of all medically determinable impairments, both severe and non-severe. *Id.* Although such challenges most often arise in the context of challenges to the sufficiency of vocational expert testimony, the law is clear that an RFC assessment that fails to take all of a claimant's credibly established limitations into account is defective. *See Rutherford v. Barnhart*, 399 F.3d 546, 554 n. 8 (3d Cir. 2005) (noting that an argument that VE testimony cannot be relied upon where an ALJ failed to recognize credibly established limitations during an RFC assessment is best

understood as a challenge to the RFC assessment itself); *Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 147 (3d Cir. 2007) (noting that an ALJ must include in the RFC those limitations which he finds to be credible). Credibly established limitations are:

> Limitations that are medically supported and otherwise uncontroverted in the record, but that are not included in the hypothetical question posed to the expert, preclude reliance on the expert's response (*Burns*, 312 F.3d at 123). Relatedly, the ALJ may not substitute his or her own expertise to refute such record evidence (*Plummer*, 186 F.3d at 429). Limitations that are medically supported but are also contradicted by other evidence in the record may or may not be found credible—the ALJ can choose to credit portions of the existing evidence but "cannot reject evidence for no reason or for the wrong reason" (a principle repeated in *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993); Reg. § 929(c)(4)). Finally, limitations that are asserted by the claimant but that lack objective medical support may possibly be considered nonetheless credible. In that respect the ALJ can reject such a limitation if there is conflicting evidence in the record, but should not reject a claimed symptom that is related to an impairment and is consistent with the medical record simply because there is no objective medical evidence to support it (Reg. § 929(c)(3)).

*Rutherford*, 399 F.3d at 554.

Moreover, because an ALJ's RFC assessment is an integral component of his or her findings at steps four and five of the sequential evaluation process, an erroneous or unsupported RFC assessment undermines the ALJ's conclusions at those steps and is generally a basis for remand.

Plaintiff's argument that the ALJ's RFC assessment is incorrect it two-fold. First, Plaintiff argues that the ALJ failed to account for Plaintiff's credibly established limitations due to syncope and right-hand impairment. Second, Plaintiff argues that the ALJ inexplicably limited Plaintiff to "light" work in the 2018 decision when a different ALJ limited Plaintiff to "sedentary" work in 2012. In support of her second argument, Plaintiff notes that she had more impairments in 2018 than she did in 2012.

1. Whether the ALJ Adequately Accounted For the Limitations Caused by Plaintiff's Shoulder, Hand Impairment and Syncope in the RFC Assessment in the 2018 Decision

During her administrative hearing, Plaintiff made the following statements about her syncope:

Q    And there were some earlier notes that I saw about you having some—what I'm going to call syncope. Where you were, like dizzy, lightheadedness. Are you still having that?

A    I do.

Q    And how often do you have that?

A    That happens only every –I don't know. Not very often. Every six, seven months.

(Admin. Tr. 47; Doc. 8-2, p. 48).

The ALJ addressed the evidence related to Plaintiff's syncope as follows:

Page 38 of 55

> Subsequently, treatment notes in 2015 indicate the claimant had vasovagal syncope with prolonged asystolic episodes in the setting of overt hypothyroidism, but symptoms resolved with treatment and as of December 2015 was noted to have no recurrent syncope. (Exhibit D8F/3. 44-56) Her last syncope episode was noted in June 2016, but was noted to [sic] related to untreated hypothyroidism. (Exhibit D13F/11)

(Admin. Tr. 19; Doc. 8-2, p. 20).

During the administrative hearing Plaintiff made the following statements about her shoulder pain:

Q      Did you also have problems with your shoulders?

A      Yes.

Q      Now, which—one or both shoulders?

A      Both.

Q      Okay. Can you tell the judge what kind of issues you've had with them?

A      It started out with the left shoulder. I've had cortisone shots—

Q      Injections?

A      Injections, yes. In that shoulder, and it didn't seem to work. Now, my right shoulder—or am I getting them confused? Yeah. They—and now I have impingements in whatever else they say is going on in there. And I have to go see an ortho doctor.

Q      Have you also had a positive ANA test for rheumatoid arthritis?

A      Yes.

Q      Did you see a rheumatologist down at Geisinger?

A        Yes.

Q        And what have they told you about your rheumatoid situation? If you remember. If not, there's a record of it.

A        I don't—I mean, I don't remember.

Q        So you—they basically told you you had rheumatoid arthritis starting?

A        Yes.

(Admin. Tr. 39-40; Doc. 8-2, pp. 40-41).

In his decision, the ALJ summarized the medical evidence related to Plaintiff's shoulder pain:

> In September 2017, the claimant reported worsening left shoulder pain, but denied radiation of pain, She also reported back pain and neck pain. At that time, physical examination indicated tenderness to palpation in the left shoulder and tenderness with range of motion. (Exhibit D21F/42) However, a radiograph (X-ray) of the lumbar spine in September 2017 showed no acute findings and age indeterminate nonspecific anterior wedging of L4 vertebral body. Around the same time, and X-ray of the cervical spine showed mild degenerative changes with no acute findings. She was referred for physical therapy. (Exhibit D21F/16-17, 39-40) In addition, an ANA screen test was positive with a Rheumatoid Factor of 11 and she was referred to a rheumatologist. (Exhibit D21F/37) In December 2017, the claimant presented for a rheumatology consultation due to positive ANA and polyarthralgias including left rotator cuff syndrome of the left shoulder with impingement and an element of left bicipital tendonitis, low back pain and buttock discomfort (hip pain). The positive ANA was determined to be a low positive with uncertain significance; it was noted that her multiple medications could have caused the positive test. Further, her musculoskeletal complaints were not related to any systemic autoimmune disease. With respect to her shoulder, it was noted that she

had not responded to injection and continued on Naproxen, which had been somewhat helpful. Notably, it was indicated that the claimant and her boyfriend took care of 10 horses on their property that required vigorous activities over the years. Physical therapy and evaluation for therapeutic exercises was recommended. Her back and buttock complaint was considered the lesser complaint and not addressed. (Exhibit D21/8-19).

(Admin. Tr. 18-19; Doc. 8-2, pp. 19-20).

Plaintiff's testimony about her hand impairment, and the ALJ's evaluation of medical evidence related to that impairment are summarized in Section IV. C of this Opinion.

The ALJ concluded that:

Overall, the evidence of record as a whole does not support a finding of debilitating impairments. The record supports a finding that the claimant's most significant impairments included post-surgical hypothyroidism due to history of thyroid cancer and thyroidectomy, history of vasovagal syncope, cervical and lumbar degenerative disc disease, left hip degenerative joint disease, right CTS, right wrist ganglion cyst and partial tear of ulnar surgace of TFC status-post wrist arthroscopy, debridement and synovectomy carpal and radiocarpal joints, pinning TFC repair and ganglion cyst excision, right ankle degenerative joint disease, right shoulder derangement and impingement, and left rotator cuff syndrome with impingement and bicipital tendinitis. However, the evidence of record shows that the symptomology due to these impairments were reduced to manageable levels with treatment during the relevant period, including surgical and conservative treatment. While the claimant continues to have some problems, the limitations outlined in the residual functional capacity adequately accounts for limitations due to the claimant's physical and mental impairments. Notably, despite the claimant's subjective allegations of severe physical and mental limitations, the undersigned finds that the evidence of record simply did not support such

limitations, but has given the claimant every benefit of the doubt by allowing for light exertional limitation along with manipulative, postural, environmental and mental limitations in the residual functional capacity. Significantly, throughout the relevant period the claimant was actively taking care of horses. Further, her allegations regarding limitations in her right hand is not fully supported by the record, which shows improvement after surgery with good hand strength.

(Admin. Tr. 19-20; Doc. 8-2, pp. 20-21).

Plaintiff argues:

7. The Plaintiff's clear testimony in this case supported by the objective medical evidence is that her right hand is good for 10-15 minutes then foes numb and becomes useless. She can only use her right hand for 10-15 minutes in the morning and afternoon and has to work with just on [sic] hand the rest of the day.

8. The Plaintiff still had heart issues that were not resolved and has bouts of syncope every six (6) or seven (7) months.

. . . .

10. A review of hypothetical question posed to the Vocational Expert would show that the Administrative Law judge failed to place restrictions on the Plaintiff's ability to work for the vast number of severe impairments that the Administrative Law Judge found pursuant to Finding of Fact and Conclusion of Law No. 2 on page 3 of Notice of Decision – Unfavorable, dated December 13, 2018, attached hereto and marked as Exhibit A and incorporated by reference herein.

11. As defined in the Social Security Law, a severe impairment, is an impairment or a combination of impairments that significantly limit the individual's physical or mental abilities and, as a result, interfere with the individuals ability to perform basic activities.

12. In addition, in response to hypothetical No 2, the Administrative Law Judge questioned whether the limitation of occasional use of the

Plaintiff's right upper extremity would preclude the performance of light jobs indicated by the Vocational Expert and the answer was yes that condition would, in fact, exclude light jobs.

(Doc. 12, pp. 5-6).

In response, the Commissioner argues:

The ALJ here thoroughly evaluated the medical evidence and reasonably determined that, despite her impairments, Plaintiff could perform a reduced range of light work with numerous additional limitations to account for her symptoms (Tr. 12-22). Notably, the record documents the following;

- *Syncope*: Prior to the relevant period, Plaintiff experienced several syncopal episodes that were found to be related to her hypothyroidism (Tr. 19, 353, 364, 660, 669). Plaintiff's symptoms resolved with adjustments to her thyroid medication (*Id.*). She reported no syncopal episodes after July 2016 (Tr. 414, 664, 669).

- *Right wrist impairment*: After complaining of right wrist numbness in October 2016, an MRI revealed a ganglion cyst along the radial margin of the distal radius (Tr. 505-507). In January 2017, Plaintiff underwent right wrist arthroscopy and repair (Tr. 18, 469). By April 2017, Plaintiff's pain was reduced to a five on a 10-point scale and she had returned to her normal activities including working with horses (Tr. 18, 451). In December 2017, Plaintiff advised Dr. Donio that wrist surgery resulted in a good outcome (Tr. 18, 805).

- *Right shoulder pain*: In March 2016, three months before her alleged onset date, Plaintiff reported right shoulder and neck pain after "lifting and putting up a fence" (Tr. 407). X-rays of her right shoulder and cervical spine were negative (Tr. 393-94). Plaintiff attended physical therapy in April 2016, but an examination revealed normal range

of motion in all joints and full strength in all extremities (Tr. 747). Plaintiff was advised to stop pushing heavy bales of hay (Tr. 747). In October 2016, Dr. Bailey evaluated Plaintiff's right shoulder pain; on examination, she had functional range of motion in her right upper extremities and Dr. Bailey explained that the findings were not significant for right shoulder impingement, nor were they related to cervical disc protrusions (Tr. 754). During a November 2016 follow-up, Dr. Bailey noted that despite Plaintiff's complaints with almost any movement, "when pushing her she is able to demonstrate full strength in all planes. Also has nearly full range of motion" (Tr. 533). Dr. Bailey administered an injection and noted that Plaintiff had "significant improvement in her pain prior to leaving the office" (Tr. 553).

- *Left shoulder pain*: In September 2017, Plaintiff reported worsening left shoulder pain (Tr. 18, 838). An examination revealed some tenderness to palpation in the left shoulder (*Id.*) During a rheumatology examination in December 2017, Plaintiff complained of left shoulder pain for the past four to six months, and indicated that it was her biggest problem (Tr. 18, 805). On examination, Plaintiff had a positive impingement sign on the left with tenderness; she was referred to physical therapy (Tr. 805).

- *Other physical findings*: Physical examination findings otherwise consistently documented a normal gait, normal coordination, normal reflexes, normal movement in the extremities, no atrophy, and full strength. *See supra*.

- *Depression, anxiety, and PTSD*: Plaintiff did not seek treatment with a mental health specialist until May 2017, almost a year after her alleged onset date. A mental status examination was largely normal and revealed that she was cooperative; had fair social skills; normal thought processes; intact concentration and attention; average intellectual functioning; and fair insight and judgment; but

was agitated, restless, with an anxious mood (Tr. 19, 852-53). Plaintiff was started on Lexapro (Tr. 19, 853), and by July 2017, she reported that she was much better and keeping "herself busy by taking care of the horses all the time" (Tr. 19, 855). In December 2017, Plaintiff reported that she was doing well, was in a good mood, and had a congruent affect (Tr. 859). In March 2018, Plaintiff was stable on her medications; she was in a good mood and had a congruent affect (Tr. 861). In June 2018, Plaintiff reported that she was doing well, and had a fair mood and congruent affect (Tr. 863).

After thoroughly reviewing the evidence, the ALJ explained that although Plaintiff had a number of impairments, "the symptomology due to these impairments were reduced to manageable levels with treatment during the relevant period, including surgical and conservative treatment. While the claimant continues to have some problems, the limitations outlined in the residual functional capacity adequately accounts for limitations due to the claimant's physical and mental impairments" (Tr. 19-20). Accordingly, the ALJ generously assessed an RFC for a reduced range of light work except that Plaintiff was further limited to:

- Frequently using foot controls with the bilateral lower extremities;

- Frequently reaching, handling, fingering and feeling with the right upper extremity;

- Frequently reaching with the left upper extremity;

- Frequently balancing, stooping, kneeling, crouching, crawling, and climbing ramps and stairs;

- Never climbing on ladders, ropes, and scaffolds;

- No exposure to hazards such as unprotected heights and dangerous moving mechanical parts and operating a motor vehicle;

- Work comprising simple routine tasks;

- No production rate pace;

- Only occasional changes in the work setting;

- Frequent interaction with supervisors, coworkers, and the public.

This comprehensive and thorough RFC was grounded in substantial evidence that the ALJ discussed throughout his decision. In doing so, the ALJ also evaluated the medical opinions in the record and explained that the state agency consultants' opinions were persuasive because their limitations were supported by and consistent with the record as a whole (Tr. 20). The ALJ also explained that Dr. Davis' marked limitations were unpersuasive because they were inconsistent with and unsupported by the medical evidence that documented, at most, only mild to moderate functional limitations (Tr. 20). Finally, the ALJ explained that Ms. Friese's October 2016 opinion that Plaintiff was employable with accommodations was unpersuasive because it contained no details as to what accommodations were required (Tr. 20). Because the above-cited evidence, which the ALJ discussed throughout his decision, provided ample evidentiary support for the ALJ's RFC, there is no basis to override it. Plaintiff's remaining challenges to the ALJ's RFC are without merit.

(Doc. 15, pp. 29-33).

Plaintiff argues that the ALJ did not account for credibly established limitations that result from Plaintiff's right shoulder impairment, hand impairment, and syncope. In support of this argument, Plaintiff cites to her own testimony and argues that if that testimony was credited she would have been found disabled. She does not include any specific citation to the record or to any objective medical evidence related to these impairments. As legal support for her argument, Plaintiff

Page 46 of 55

cites to the definition of a "severe" impairment at step two, which provides "[a]n impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. § 416.922(a). The same regulation defines "basic work activities" as:

(1)   Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

(2)   Capacities for seeing, hearing, and speaking;

(3)   Understanding, carrying out, and remembering simple instructions;

(4)   Use of judgment;

(5)   Responding appropriately to supervision, co-workers and usual work situations; and

(6)   Dealing with changes in a routine work setting.

20 C.F.R. § 416.922(b). Conversely, an impairment is "severe" if it *does* significantly limit a claimant's physical or mental ability to do basic work activities. The phrase, "significantly limits," however is not synonymous with "disability." Rather, the ALJ's analysis at step two is a threshold test designed to screen out *de minimis* claims. Thus, I am not persuaded that the limitations alleged by Plaintiff in her testimony should be credited simply because these impairments were found to be "severe" at step two.

In response to Plaintiff's argument, the Commissioner cited to objective evidence supporting the ALJ's conclusion.

The Commissioner argues that Plaintiff's most recent syncopal episode occurred in July 2016. An October 13, 2016 treatment record from Susquehanna Health states:

> The etiology of her syncope is likely vasovagal or due to untreated hypothyroidism. Now that her hypothyroidism is better managed her symptoms are significantly better. She had not had any syncope since July.

(Admin. Tr. 669; Doc. 8-9, p. 137). Plaintiff has cited to no objective evidence suggesting that she had any further syncopal episodes after July 2016. I also note that the ALJ limited Plaintiff to occupations where she would not be exposed to unprotected heights or hazardous machinery. Plaintiff does not suggest what other limitations might result from this impairment or explain why those limitations should be credited.

Next, Plaintiff suggests that she can only occasionally use her right arm—a limitation which appears to flow from her right hand and shoulder impairment. In the RFC assessment, the ALJ limited Plaintiff to "frequent" (rather than "occasional") use of her right arm. Once again, Plaintiff does not cite to any evidence to support her position that this limitation is credibly established. By contrast, the evidence cited by the Commissioner shows that Plaintiff had a functional range of

Page 48 of 55

motion in her arm, and that the right wrist surgery reduced Plaintiff's hand pain. Specifically, April 2016 physical therapy records report that Plaintiff had full strength in her right upper extremity but did have decreased grip strength (grip strength was measured as 40 pounds on the right and 66 pounds on the left). (Admin. Tr. 747; Doc. 8-10, p. 69). An October 2016 functional assessment done by a physical therapist documents that Plaintiff had no restriction to her ability to carry, move and handle objects and did not require assistance for daily tasks, but did experience right shoulder pain while completing tasks. (Admin. Tr. 755; Doc. 8-10, p. 77). During a follow-up exam four months after Plaintiff's January 2017 wrist surgery Plaintiff reported that she had returned to some of her normal activities. (Admin. Tr. 452; Doc. 8-8, p. 30). Plaintiff had good sensation and capillary refill and was able to make a full fist. Plaintiff was advised to make sure her incision was covered and well protected during farm work. *Id.* December 2017 rheumatology records note that Plaintiff "had right wrist surgery for a triangular fibrocartilage tear and ganglion cyst with good outcome there." (Admin. Tr. 804; Doc. 8-11, p. 9). Nothing in the objective records cited by either party suggests a greater degree of limitation than accounted for by the ALJ. Furthermore, as discussed in Section IV. C. of this Opinion, the ALJ did not err by discounting Plaintiff's testimony about her

hand. Accordingly, I am not persuaded that remand is required for further consideration of Plaintiff right hand and arm impairments.

> 2. Whether the ALJ erred by Imposing a Less Restrictive RFC in 2018 than A Different ALJ Imposed in 2012

Plaintiff argues:

1. In the Plaintiff's previous Notice of Decision – Unfavorable dated December 14, 2012, the prior Administrative Law Judge found the Plaintiff limited to unskilled sedentary employment. See pages 8 and 9 of the Notice of Decision – Unfavorable marked as Exhibit A and incorporated by reference herein.

2. That particular Decision found the Plaintiff has the following severe impairments:

"Thyroid cancer status post thyroidectomy, degenerative disc disease of the spine, left hip degeneration, depression and anxiety". See Finding of Fact and Conclusion of Law No 2, page 3 of the Notice of Decision – Unfavorable marked as Exhibit A and incorporated by reference herein.

3. In this particular case, the Administrative Law Judge found in the most recent Notice of Decision, dated December 13, 2018, Finding of Fact and Conclusion of Law No. 2, page 3 which was appealed, that the Plaintiff suffered from the following severe impairments, "the claimant has the following severe impairments: post-surgical hypothyroidism, history of thyroid cancer and thyroidectomy, history of vasovagal syncope, cervical and lumbar degenerative disc disease, left hip degenerative disc disease, left hip degenerative disc joint disease, right carpal tunnel syndrome (CTS), right wrist ganglion cyst and partial tear of ulnar surface of triangular fibrocartilage (FTC) status-post wrist arthroscopy, debridement and synovectomy carpal and radiocarpal joints, pinning, TFC repair and ganglion cyst excision, right ankle degenerative joint disease, right shoulder derangement and impingement, left rotator cuff syndrome with impingement and

bicipital tendinitis, major depressive disorder (MDD), bipolar disorder, anxiety disorder and post-traumatic stress disorder (PTSD).

4. Despite finding many additional severe impairments and keeping in mid that in order for an impairment to be severe it must provide for work related limitations of function. The most recent Administrative Law Judge found the Plaintiff was able to perform a range of light employment.

(Doc. 12, pp. 4-5).

The Commissioner does not address this argument.

Plaintiff argues that the ALJ's RFC assessment that Plaintiff could do a limited range of "light work" during the period between June 15, 2016 and December 13, 2018, must be wrong because a different ALJ determined that Plaintiff was limited to "sedentary" work during the period between February 14, 2008 and December 14, 2012. Plaintiff was found "not disabled" by both ALJs. In support of her argument, Plaintiff generally alleges that Plaintiff had more medically determinable impairments during the period between June 15, 2016 and December 13, 2018, than she did during the period between February 14, 2008 and December 14, 2012. Plaintiff has cited no statute, regulation, social security ruling, or caselaw to support her position that a person is always more limited if he or she has more impairments. Absent any such authority, and based on my review of the ALJ's decision in this case and the evidence that supports it, I am not persuaded that remand

is required simply because the ALJ arrived at a less restrictive RFC than a different ALJ evaluating a different period of time based on different evidence.

### E. WHETHER THE ALJ ERRED WHEN HE FOUND PLAINTIFF HAD NO PAST RELEVANT WORK IN HIS 2018 DECISION

The Commissioner's regulations define "work experience" as the "skills and abilities [the claimant] has acquired through work [the claimant has] done which show the type of work [the claimant] may be expected to do." 20 C.F.R. § 416.965(a). A claimant's work experience is only "relevant" (1) when it was done within the last 15 years, (2) if the job lasted long enough for the claimant to learn to do it, and (3) if it was substantial gainful activity. *Id.*

When asked about her employment history, Plaintiff testified:

Q      I'm looking back 15 years from today at your past relevant work. And I just want to confirm that you worked these positions within this 15 year window. The first one would have been at McDonald's, you were a crew member, is that correct?

A      Yes.

Q      From, looks like, January of '15 to June of '16?

A      Yes.

Q      You also worked at Smerfit-Stone doing labor from June of '05 to November of '05?

A      That's correct.

Q      And you worked at Walmart as a sales associate June of '04 to August of '04?

A That would be correct.

(Admin. Tr. 36; Doc. 8-2, p. 37).

When asked to classify Plaintiff's past employment the VE testified:

Q Ms. Abraham, could you please describe the claimant's past work? And it's the three positions I mentioned earlier in the hearing today, and also her vocational profile?

A Yes, judge. Presently, this is a younger individual, I have 33 years of age, who testified today she does have a GED. In regard to past work, the first position we're looking at McDonald's. The claimant indicated that she worked as a fast food cook, which is defined in the DOT as medium, skilled, with an SVP of five. Based upon the file information, the claimant indicated lifting up to 50 pounds, which would then be consistent with medium work as performed. The second position, she indicated she was performing work activity as a machine operator. Based upon this description of the claimant's job duties, it would be described in the DOT as cutting machine operator, which would be a medium, semi-skilled position with an svp of three. The claimant again lifted—indicated lifting up to 25 pounds, which would then be consistent with medium work as performed. Lastly, we have her work activity with Walmart. Based upon the file information, the claimant indicated that she was a stock clerk, and this is defined in the DOT as heavy, semi-skilled, with an svp of four. Based upon the file information, the claimant indicated lifting up to 10 pounds, which would place the position into light work as performed.

(Admin. Tr. 50-51; Doc. 8-2, pp. 51-52).

In his decision, the ALJ concluded that "[t]he claimant has no past relevant work." (Admin. Tr. 21; Doc. 8-2, p. 22). No explanation for this finding is included in the decision.

Plaintiff argues:

5. In the most recent notice of Decision – Unfavorable, dated December 13, 2018, Finding of Fact and Conclusion of Law no. 5 on page 10, attached hereto and marked as Exhibit A and incorporated by reference herein, the Administrative Law Judge found "The claimant has no past relevant work".

6. In fact, the Plaintiff had returned to work after the last Notice of Decision – Unfavorable dated December 13, 2018, and had worked for a period of approximately one (1) year at the Lock Haven McDonald's before having to terminate employment due to physical issues of her hands and back and a sexual harassment issue which mentally she was unable to deal with.

. . . .

8. . . . The Vocational Expert in this case testified that the Claimant did have prior employment including a cook at McDonald's, a machine operator at Smurfit Stone and a stocker at Walmart. The McDonald's job was medium SVP of 5, the machine operator job was a medium job SVP of 3, and the Walmart stocker job was a heavy job with SVP of 4.

(Doc. 12, pp. 5-6).

The Commissioner does not respond to this argument.

At step four of the sequential evaluation process, the ALJ considers whether a claimant can engage in his or her past relevant work. 20 C.F.R. § 416.920(4)(iv). If a claimant *can* do his or her past relevant work, the claimant is found *not disabled* at step four. *Id.* In this case, the ALJ found that Plaintiff had no past relevant work. Essentially, he ruled in Plaintiff's favor and continued on to step five of the sequential evaluation process. Thus, assuming the ALJ erred by failing to discuss

Plaintiff's past employment in the decision, this error had no impact on the outcome of the case because the ALJ continued to step five. "No principle of administrative law "require[s] that we convert judicial review of agency action into a ping-pong game" in search of the perfect decision." *Coy v. Astrue,* No. 8-1372, 2009 WL 2043491 at *14 (W.D.Pa. Jul. 8, 2009)(*citing NLRB v. Wyman–Gordon Co.,* 394 U.S. 759, 766 n. 6 (1969)). I am not persuaded that remand is required to address an issue that had no bearing on the outcome of this case. To the extent the ALJ erred at step four, this error is harmless.

## V.    CONCLUSION

Accordingly, I find that that Plaintiff's request for award benefits, or in the alternative remand with instructions to conduct a new administrative hearing is DENIED as follows:

(1) The final decision of the Commissioner is AFFIRMED.

(2) Final judgment will be issued in favor of the Commissioner of the Social Security Administration.

(3) An appropriate order will follow.

Date: January 20, 2021                    BY THE COURT

                                          *s/William I. Arbuckle*
                                          William I. Arbuckle
                                          U.S. Magistrate Judge